**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **AMY A. GROAT** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. WGC-10-235** |
| | ) | |
| **WAL-MART STORES, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Amy A. Groat ("Mrs. Groat") brought this action against Defendant Wal-Mart Stores, Inc. ("Wal-Mart") alleging negligence and seeking damages in the amount of seven hundred fifty thousand dollars ($750,000.00). The parties consented to proceed before a United States Magistrate Judge for all further proceedings in the case and the entry of a final judgment. *See* Document No. 10. The case thereafter was referred to the undersigned. *See* Document No. 11. Pending before the Court and ready for resolution is Wal-Mart's Motion for Summary Judgment (Document No. 17). Mrs. Groat filed a Response in Opposition (Document No. 18), Wal-Mart a Reply (Document No. 19) and Mrs. Groat a Sur-Reply (Document No. 22).[1]

Both parties requested an oral hearing. *See* Document Nos. 17, 18. No hearing is deemed necessary and therefore both requests for oral hearing are **DENIED**. The Court now rules pursuant to Local Rule 105.6 (D. Md. 2010).

---

[1] With the Court's permission. *See* Document No. 24 (Order of September 17, 2010).

## BACKGROUND[2]

On the night of January 3, 2009, sometime after 9:00 p.m., Mrs. Groat, her husband and two sons visited the Wal-Mart store located at 40 Drury Drive, La Plata, Maryland, after having dinner at the Texas Roadhouse. Mem. P. & A. Supp. Pl.'s Opp'n ("Pl.'s Mem."), Ex. 3 (C. Groat Dep. 9:7 – 11, 19 – 21). The family initially walked the store together. They were in the area of the store where dog food is sold. The family was preparing to depart the store when Mrs. Groat recalled that she wanted to purchase Dixie cups. The family then divided into two pairs: Mrs. Groat, accompanied by her son Collin, would go retrieve the Dixie cups, while Mr. Groat and the younger son, Steven, would select the dog food. The pairs would meet at the front of the store. *Id.*, Ex. 4 (A. Groat Dep. 25:1 – 8).

Shortly after Mrs. Groat and her son Collin walked away from Mr. Groat and Steven in pursuit of the Dixie cups, Mrs. Groat fell while walking down an aisle.

> Q: How long were you and your mom shopping together alone – – when I say alone, I mean just the two of you – – before your mom fell, if you can remember?
>
> A: Like 30 seconds. We were walking to go get something. We left my dad and my brother and we were walking to get whatever it was that we were getting and she fell.
>
> \*                    \*                    \*
>
> Q: Tell me with as much detail as you can remember how your mother fell? What happened? Start ten seconds before she fell and just walk me through it.

---

[2] In determining whether the moving party has shown there are no genuine issues of any material fact, this Court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 438 (4th Cir. 1998).

A:  We were walking next to each other and then neither of us saw the spill, and then like out of the corner of her eye I saw – – or my eye I saw her go down and one of her arms like kind of flailed up and then I heard her say something.

Q:  What did she say?

A:  I don't remember what she said. I think it was just like ow or something.  I don't remember exactly.

Q:  When your mom fell, what part of the store were you guys in?

A:  We were by the cleaning shelf and all the – – like the toilet paper and stuff right across from the paint.

*Id.*, Ex. 3 (C. Groat Dep. 10:20 – 11:5, 11 – 12:6).

Mrs. Groat provided additional details about the sequence of events before she fell.

Q:  You were looking for Dixie cups?

A:  Yes.

Q:  Did you know where they were?

A:  Yes.

Q:  Where were they from where you fell?

A:  About two more aisles down on the left is where the paper goods are, the paper plates and things like that.

Q:  Okay.

A:  That's where I had gotten them in the past.  I presume they were still there at that time.

Q:  When you and Collin were walking down that aisle, were you looking for anything else?

A:  No.

Q:  Were you looking to your right or to your left?

3

> A:  We were just walking along not looking for anything in
> that particular area.
>
> Q:  Once you made that right-handed turn into that aisle,
> how long were you in that aisle before you fell?
>
> A:  Maybe 30 seconds.

*Id.*, Ex. 4 (A. Groat Dep. 30:11 – 31:10).

Mrs. Groat did not fall completely on the floor.  Her right foot slipped on the liquid on the storeroom floor, sticking forward.  Mrs. Groat fell down on her left knee, kneeling on that knee.  Her bottom or rear end did not touch the floor.  According to Collin his mother landed on her left foot.  *Id.*, Ex. 3 (C. Groat Dep. 21:16 – 22:6).

At the time Mrs. Groat slipped and fell, she was not carrying anything in her hands.  She wore her purse on her shoulder.  *Id.*, Ex. 3 (C. Groat Dep. 24:1 – 8); Ex. 4 (A. Groat Dep. 29:4 - 5).

Mrs. Groat reached out to Collin for assistance in standing up.  It took Mrs. Groat about five or ten seconds to stand up after slipping and falling.  Less than a minute later a Wal-Mart employee, Melinda Johnson, arrived at the scene with powder and a broom.  *Id.*, Ex. 3 (C. Groat Dep. 24:20 – 25:3, 26:10 – 20).  Mrs. Groat generally agreed with Collin's recollection that the time between her falling and standing was approximately ten seconds.  *Id.*, Ex. 4 (A. Groat Dep. 33:10 – 19).  Mrs. Groat recalled, about 30 seconds after standing up, the Wal-Mart employee arrived at the scene.  *Id.*, Ex. 4 (A. Groat Dep. 33:20 – 34:1).  Mrs. Groat distinctly recalled the Wal-Mart employee arriving before her husband arrived at the scene because Mrs. Groat yelled for her husband.

> Q:  Who do you recall arriving first, your husband or the
> female employee?

A: The female employee arrived first, and the reason I know that is because I had to – – I was yelling to my husband who was now just about the end of the aisle that we were walking down to get me some paper towels.

Q: Okay. You said you were yelling to your husband?

A: Um-hmmm.

Q: Is that a yes?

A: Yes.

Q: Was your husband visible to you when you were yelling to him?

A: Not at first.

Q: Okay.

A: But I knew he couldn't be far away. We had just walked away from him.

Q: And when you were yelling, did you see him further down before the employee arrived?

A: No. She came up. She came around the same path that we did and she approached me, asked me what I was doing.

She said, "What are you doing?" And then she said, "Oh, you fell."

*Id.*, Ex. 4 (A. Groat Dep. 31:20 – 32:22).

Collin confirmed his mother's testimony regarding the statements of the Wal-Mart employee.

Q: Did you see anybody clean up the spill on the floor?

A: The lady that came.

Q: Okay. And how did she clean it up?

A: She poured the powder in it to soak it up and then she swept it up.

       \*               \*             \*

> Q:   Was the first lady that arrived at the accident scene polite?
>
> A:  Not really.
>
> Q:  How was she not polite?
>
> A:  She kind of came up and she was like – – she was rude. She was like what are you doing, like acting like she was doing something wrong.  Then she was like – – she had an attitude with it.  She was like, Oh, so you fell in that?
>
> Q:  Okay.
>
> A:  It was like she seemed rude and it sounded like she had an attitude.

*Id.*, Ex. 3 (C. Groat Dep. 29:9 – 14, 30:11 – 22).

Collin however did not recall the Wal-Mart employee arriving on the scene first.

> Q:   As your mom was getting up, your dad and your brother arrived at the accident scene?
>
> A:  I think she was up when they got there.
>
> Q:  So your dad and brother arrived before the short female employee did?
>
> A:  I think so.

*Id.*, Ex. 3 (C. Groat Dep. 31:14 – 19).

From Mr. Groat's recollection of events, the Wal-Mart employee was on the scene before he arrived.

> 4.   That following our entry into the store, we shopped separate from each other with my son Collin, accompanying my wife, the Plaintiff.
>
> 5.  That shortly after we separated, I heard my wife call to me and I went to find her.  Subsequently, I found my wife

> trying to get up from the floor after having fallen on what appeared to be a light blue liquid.
>
> 6. That when I came to the aid of my wife, I noticed a store employee standing near us with a broom and a can of powder.

Pl.'s Resp. Def.'s Reply Mem. ("Pl.'s Sur-Reply"), Ex. 1 (J. Groat Aff. ¶¶ 4 – 6).

According to Mrs. Groat, her family helped her to the paint counter. Then her husband asked the Wal-Mart employee to call for a manager. The employee complied though not immediately. Pl.'s Mem., Ex. 4 (A. Groat Dep. 35:14 – 36:10).

The Wal-Mart employee, Ms. Johnson, apparently reported Mrs. Groat's slip and fall over the walkie talkie. Andrea Basped, Assistant Manager Overnight, heard "there was a Code White in the paper goods and chemicals." *Id.*, Ex. 5 (Basped Dep. 7:3 - 4). Code White means a customer accident or accident. In response to this report, Ms. Basped went to the manager's office, grabbed an accident file, and then walked to the paper goods and chemicals section of the store. *Id.*, Ex. 5 (Basped Dep. 7:14 - 19).

When Ms. Basped arrived at the scene, she observed Mrs. Groat sitting on top of the paint counter. Based on Ms. Basped's discussion with Mrs. Groat, Ms. Basped learned the accident occurred across the aisle from the paint counter.

By the time Ms. Basped arrived at the scene, there was no evidence of what caused Mrs. Groat to slip and fall.

> A: When I had gotten there, there was nothing there to see.
>
> Q: It had been – – well, let me ask you, when you got to the area that they say the incident occurred, whatever had been spilled, if anything, was gone?
>
> A: Yes, sir.

> Q: So as far as you could tell, anything that would have needed to be done to mop up, clean up the area had already been accomplished and now the floor is back to its regular condition?
>
> A: Yes, sir.

*Id.*, Ex. 5 (Basped Dep. 10:11 - 22).

According to Collin, laundry detergent was the substance on the floor which caused his mother to slip and fall. *See id.*, Ex. 3 (C. Groat Dep. 17:9 - 19). As a result of Mrs. Groat's slip and fall, Ms. Basped completed a Wal-Mart claim report which was filed online. *Id.*, Ex. 1. The claim report states liquid laundry soap, about a half of a bottle, was on the floor when Mrs. Groat slipped and fell. Mrs. Groat's counsel questioned Ms. Basped regarding this claim report.

> Q: The first page of the report goes down through various descriptions and one of the descriptions I see is liquid laundry soap.
>
> A: Yes, sir.
>
> Q: How did you confirm for the purposes of the report that liquid laundry soap was involved in this incident?
>
> A: The customer.
>
> Q: And the amount, it indicates half bottle. How did you confirm that information?
>
> A: The customer as well.
>
> Q: Did the customer actually indicate that a half bottle had spilled on the floor or was that the estimate of the quantity?
>
> A: She estimated about half a bottle.
>
> Q: Was there ever a bottle found in the location?
>
> A: No.

*Id.*, Ex. 5 (Basped Dep. 20:10 – 21:5).

Ms. Basped also spoke with Ms. Johnson, the Wal-Mart employee who responded to the scene of the incident.

> Q:  Who is Ms. Johnson?
>
> A:  She's an overnight stocker.
>
> Q:   And how do we know that Ms. Johnson reported the incident?
>
> A:  She worked in that area.
>
> Q:  Did you speak to Ms. Johnson directly?
>
> A:  I spoke to her and she said that a lady had fell [sic].
>
> Q:   And did she say how?  Did Ms. Johnson tell you how she knew the lady had fallen?
>
> A:   No.  I believe – – no, she didn't say how the lady had fell [sic].   She just said the lady said that there was something on the floor.
>
> Q:  That's what Ms. Johnson said to you?
>
> A:  Um-hmm.
>
> Q:  Yes?
>
> A:  Yes.
>
> Q:   Did anyone in the store confirm what substance may have been on the floor?
>
> A:  No.

*Id.*, Ex. 5 (Basped Dep. 13:12 – 14:9).

## JURISDICTION AND VENUE

Subject matter jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.  Mrs. Groat resides in White Plains, Maryland.  *See* Compl.  Wal-Mart is

incorporated in the State of Delaware and its principal place of business is Bentonville, Arkansas. Document No. 1 ¶ 6. The amount in controversy exceeds $75,000.00, exclusive of interest and costs. *Id.* ¶ 7.

Pursuant to 28 U.S.C. § 1391 venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this district. The Court notes Wal-Mart removed this case from state court to federal court. *See* Document No. 1.

## STANDARD OF REVIEW

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d

592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.

On those issues where the nonmoving party will have the burden of proof, it is that party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence.  *Anderson*, 477 U.S. at 256.  However, "'[a] mere scintilla of evidence is not enough to create a fact issue.'"  *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959 (1968)).  There must be "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

## DISCUSSION

A.     *Overview – Premises Liability*

Before addressing the parties' positions regarding genuine issues as to any material fact, the Court must address some preliminary matters.  Since this Court's jurisdiction is based on diversity of citizenship, the principles outlined in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938) require the application of Maryland law to substantive law questions.  Under Maryland law a property owner owes a certain duty to an individual who comes in contact with the property, and the scope of the duty owed is dependent upon the individual's status while on the property.  *Baltimore Gas & Elec. Co.*

*v. Flippo*, 348 Md. 680, 688, 705 A.2d 1144, 1148 (1998). Maryland law recognizes four categories of individuals: (1) an invitee, (2) a licensee by invitation, (3) a bare licensee and (4) a trespasser. An invitee is an individual who is on the property for a purpose related to the landowner's business. "An occupier of land has a duty to use reasonable and ordinary care to keep the premises safe for an invitee and to protect him from injury caused by an unreasonable risk that the invitee, by exercising ordinary care for his own safety, will not discover." *Henley v. Prince George's County*, 305 Md. 320, 339, 503 A.2d 1333, 1343 (1986).

A licensee by invitation is a social guest and the landowner "owes a duty to exercise reasonable care to warn the guest of dangerous conditions that are known to the [landowner] but not easily discoverable." *Flippo*, 348 Md. at 689, 705 A.2d at 1148 (citation omitted). For a bare licensee, a person on the property with permission but for his/her own purposes, a landowner only owes a duty to refrain from willfully or wantonly injuring the bare licensee and to refrain from creating "'new and undisclosed sources of danger without warning the [bare] licensee.'" *Id.* (citation omitted). For a trespasser, someone who intentionally and without permission enters another's property, a landowner owes no duty except refraining from willfully or wantonly injuring or entrapping the trespasser.

On January 3, 2009 Mrs. Groat was a customer at the Wal-Mart store in LaPlata, Maryland. She was in the store with her family to purchase merchandise. Mrs. Groat was in the store for a purpose related to Wal-Mart's business. Mrs. Groat was thus an invitee.

*B.*      *Negligence*

Under Maryland law negligence means doing something a person using reasonable care would not do, or not doing something a person using reasonable care would do. *Maryland Civil Pattern Jury Instruction* 19:1. Ordinary or reasonable care means "that caution, attention or skill a reasonable person would use under similar circumstances." *Id.* To establish a *prima facie* case of negligence, Mrs. Groat must prove "'(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.'" *Valentine v. On Target*, 353 Md. 544, 549, 727 A.2d 947, 949 (1999) (quoting *BG & E v. Lane*, 338 Md. 34, 43, 656 A.2d 307, 311 (1995), citing *Rosenblatt v. Exxon*, 335 Md. 58, 76, 642 A.2d 180, 188 (1994)).

Wal-Mart owes a duty of ordinary care to keep its premises safe for an invitee such as Mrs. Groat. That duty is defined as follows:

> [A]n owner or occupier of land only has a duty to exercise reasonable care to "protect the invitee from injury caused by an unreasonable risk" that the invitee would be unlikely to perceive in the exercise of ordinary care for his or her own safety, and about which the owner knows or could have discovered in the exercise of reasonable care. The duties of a business invitor thus include the obligation to warn invitees of known hidden dangers, a duty to inspect, and a duty to take reasonable precautions against foreseeable dangers.

*Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md. App. 381, 388, 693 A.2d 370, 374 (1997) (internal citations omitted).

Wal-Mart is not an insurer of Mrs. Groat's safety while Mrs. Groat is on its premises. "[N]o presumption of negligence on the part of the owner arises merely from a

showing that an injury was sustained in his store." *Moulden v. Greenbelt Consumer Servs., Inc.*, 239 Md. 229, 232, 210 A.2d 724, 725 (1965).  Therefore, "[i]n an action by a customer to recover damages resulting from a fall in a store caused by a foreign substance on the floor or stairway, the burden is on the customer to produce evidence that the storekeeper created the dangerous condition or had actual or constructive knowledge of its existence." *Rawls v. Hochschild, Kohn & Co.*, 207 Md. 113, 119, 113 A.2d 405, 408 (1955).

The parties do not dispute that Wal-Mart owed a duty of ordinary care to keep its store in a reasonably safe condition for Mrs. Groat, an invitee.  Mrs. Groat contends Wal-Mart breached that duty because Wal-Mart had *actual knowledge* of the liquid substance on the floor based on (a) Ms. Johnson's appearance at the scene of the incident within moments after Mrs. Groat fell and (b) the fact that Ms. Johnson was carrying in her hand, within moments of Mrs. Groat's fall, a broom and a powder (an absorbent to soak up liquid).  According to Mrs. Groat, because Ms. Johnson arrived at the scene with tools to clean up a spill and further because Ms. Johnson initially questioned why Mrs. Groat was in the area but then remarked, "oh, you fell," Wal-Mart obviously was aware of the spill and thus was obligated to warn Mrs. Groat about the dangerous condition.  "There were no warning signs, tapes, flags or other indications to [Mrs. Groat] that the wet substance was on the floor and *was in the process of being remediated*."  Compl. ¶ 8 (emphasis added).

Mrs. Groat testified that she did not see the liquid on the floor before slipping and falling.

> Q:  Did you see the liquid on the floor before you fell?

A:  No.

Q:  Do you know how it got on the floor?

A:  No.

Q:  Do you know how long it was on the floor before you stepped in it?

A:  No.

Q:  What color was the liquid?

A:  Light blue.

Q:  Was there anything obstructing your view of the sales floor as you were walking back?

A:  No.

Q:  The sales floor was what color?

A:  I believe it's not beige but not white, so in between it.

Q:  A light color?

A:  Probably.

Q:  Tile?

A:  It's not a solid color.  I think it has like a fleck or something in it.

Q:  The store was lit by fluorescent lights?

A:  I presume.

Q:  Okay.  Was it adequately lit?

A:  Sure, yes.

Pl.'s Mem., Ex. 4 (A. Groat Dep. 27:8 – 28:10).

Her son Collin provided additional details about the liquid on the floor.

Q:   Do you know what was on the floor that caused your mom to slip?

A:  I think it was laundry detergent.

Q:   What color was it?

A:  Blue.

Q:   What makes you think it was laundry detergent?

A:   There was a bunch of bottles of laundry detergent right on the shelf next to it and it just looked like laundry detergent and it smelled like laundry detergent.

*                              *                              *

Q:   Did you see any open bottles at or near that area?

A:  I don't think so.

Q:  Do you remember any bottles laying on the floor turned over sideways or anything of that nature?

A:  No.

Q:   Were the bottles as you're walking towards the back of the store, the bottles you just described, were they to your right or to your left?

A:   Left.

Q:  So they were closer to you than to your mom?

A:   They were closer to her.  They were on her side.

Q:  I'm sorry.

A:   I was on the right of her, so they were on her side.

Q:   You didn't see any detergent dripping down any of the bottles that were up on the shelf, did you?

A:  I didn't see it.

Q:   The detergent – – I'm just calling it detergent because you told me that's what you thought it was.  The detergent you saw on the floor, how much detergent was on the floor?

A:  It was a puddle about ten, twelve inches wide.

Q:  How long was it?

A:  Probably ten, fifteen inches, somewhere around there.

Q:   So you think it was longer than it was wide or is it more of a square area?

A:   I think it was just like a splatter of it just kind of went everywhere.

Q:  Okay.

A:  I don't remember if it was longer or wider.

*Id.*, Ex. 3 (C. Groat Dep. 17:9 – 19, 18:1 – 19:12).

Like his mother, Collin did not see the liquid on the floor before his mother slipped.

Q:   Did you see detergent on the floor before your mom stepped in it?

A:  No.

Q:  Do you know how it got on the floor?

A:  I guess it spilled.

Q:   Without guessing, do you know how it got on the floor?

A:  No, I don't.

Q:   Do you know how long it was on the floor before your mother stepped in it?

A:  No.

*                          *

> Q:    You didn't see any other footprints through that laundry detergent, did you?
>
> A:  No.
>
> Q:  You didn't see any cart marks through it?
>
> A:  I don't remember.

*Id.*, Ex. 3 (C. Groat Dep. 20:13 – 21:1, 7 – 11).

Wal-Mart argues Mrs. Groat fails to produce any facts about "time on the floor" evidence and thus Mrs. Groat cannot prove Wal-Mart's negligence.  In *Maans v. Giant of Maryland, LLC*, 161 Md. App. 620, 639-40, 871 A.2d 627, 638 (2005), the Maryland Court of Special Appeals explained the purposes of "time on the floor" evidence.

> (1) [I]t requires a demonstration of how long the dangerous condition existed prior to the accident so that the fact-finder can decide whether the storekeeper would have discovered it if he or she had exercised ordinary care; and (2) it also shows that the interval between inspections was at least as long as the time on the floor.  Thus, proof of time on the floor is relevant, not only as to notice but also as to the issue of what care was exercised.

Mrs. Groat asserts she has presented evidence that Ms. Johnson was en route to contain the spill at the time she (Mrs. Groat) slipped and fell.

> At the time of the incident, Melinda Johnson suddenly appeared with a broom and the specific material to contain the spill.  In fact, this was her area to maintain, inspect and supervise.  Ms. Johnson, on behalf of the Defendant, had clear knowledge or constructive notice that the laundry detergent had been spilled in the aisle prior to the time the Plaintiff encountered it.  The Defendant completely ignores that.  Contained within the spill station a few feet away was also a safety cone.  The store employee took absolutely no action to warn the Plaintiff of the danger or take any other action to divert pedestrian traffic away from the area.

18

> These facts are clearly admissible and are not based on speculation or conjecture.

Pl.'s Mem. at 10-11.

Wal-Mart rejects Mrs. Groat's contention that Ms. Johnson's rapid response to the scene indicates Wal-Mart knew or had constructive notice of the dangerous condition on the floor.

> Plaintiff strenuously argues that because Melinda Johnson, a store employee, arrived within minutes after Plaintiff's fall, an inference should exist that the store had actual or constructive notice of the spill. Plaintiff produces no legal authority to support this contention. It should be noted that Plaintiff never bothered to depose Ms. Johnson even though she is still employed by Wal-Mart. Even if the fall occurs in the immediate vicinity of a store employee, the Court of Appeals has affirmatively stated that the location of an accident in the proximity of an employee does not create any inference of constructive notice.

Def.'s Reply at 4. Wal-Mart reiterates that Mrs. Groat has not presented any evidence about "time on the floor." Because Mrs. Groat is unable to establish how long the dangerous condition existed, she cannot prove negligence by Wal-Mart.

In her Sur-reply Mrs. Groat contends the facts in her case are analogous to *Keene v. Arland's Department Store, Baltimore*, 35 Md. App. 250, 370 A.2d 124 (1977) and *Konka v. Wal-Mart Stores, Inc.*, No. 97-1013, 1998 WL 24378 (4th Cir. Jan. 26, 1998) where the courts found, based on the facts and circumstances of the case, that the store had knowledge of the dangerous condition or had constructive knowledge and/or caused the dangerous condition.

> [I]t is clear from the testimony that the Defendant Wal-Mart employees were given specific instruction to address inadvertent spills and the precautions to take when a spill is encountered. The testimony of the manager clearly indicated that "spill stations" are placed at all areas where

> an incident could occur. This is the similar awareness that the *Konka* court placed on Wal-Mart regarding the possibility of a wet floor. With this context, it is clear that the Plaintiff is entitled to the inference that Melinda Johnson was coming to the exact location where the spill occurred. The Plaintiff is entitled to the inference that when Melinda Johnson stated that "oh, you fell in that," she was referring to the spill that she was going to address with the mop and absorbent powder.

Pl.'s Sur-Reply at 5.

This Court finds the facts and circumstances of *Keene* distinguishable from this case. In *Keene* the customer, Mrs. Keene, slipped and fell on the floor as she walked toward her husband standing in the check-out line. A store employee working in the check-out line blurted out, "'I told them if this wasn't cleaned up, someone's going to fall.'" *Keene*, 35 Md. App. at 252, 370 A.2d at 126. Mr. Keene had been standing in the check-out line for approximately 15 minutes. He observed the cashier who blurted out the statement during the entire 15 minute period. During that period the cashier interacted with customers only and the cashier never left the booth at any time. The Court of Special Appeals found, presuming the jury believed Mr. Keene's testimony, that

> it could have inferred that as no persons other than customers were in communication with the cashier for a period of fifteen minutes, then the warning given to "them" – – "that if this wasn't cleaned up, someone's going to fall," was given more than fifteen minutes before Mrs. Keene fell.

*Id.* at 258, 370 A.2d at 129. In contrast to *Keene*, in this case Mrs. Groat has not presented *any* evidence about "time on the floor" nor is there any statement by a Wal-Mart employee indicating the store was aware of the dangerous condition *before* Mrs. Groat slipped and fell.

This Court also finds the facts and circumstances of *Konka* distinguishable. In *Konka* the customer, Mrs. Konka, slipped and fell by the patio door of the lawn and garden department. When Mrs. Konka and her husband arrived at Wal-Mart, it was raining heavily and they noticed extra mats and safety cones at the front entrance. It was still raining when they headed to the lawn and garden department. The doors to that department were open. There were no warning cones near the doors and a mat was placed a few feet back from the threshold. The Court of Appeals for the Fourth Circuit found sufficient evidence was presented for a jury to reasonably conclude that Wal-Mart either caused the dangerous condition by allowing the doors to the lawn and garden department to remain open thus allowing rain to blow through the doors. Or, a jury could reasonably conclude that Wal-Mart had constructive knowledge of the dangerous condition because some employee (either the store's greeter or the manager of the lawn and garden department) had a special duty to observe the area, watching for hazards.

In this case Mrs. Groat has not presented any evidence from which it could be reasonably inferred that Wal-Mart created the dangerous condition. There is no evidence that Wal-Mart had actual knowledge of the dangerous condition. Mrs. Groat thus must establish that Wal-Mart had constructive knowledge.

Mrs. Groat claims Ms. Johnson's appearance at the scene with a broom and an absorbent powder, less than a minute after Mrs. Groat slipped and fell, demonstrates Ms. Johnson knew of the spill and in fact was responding to the spill. Ms. Basped, the assistant manager, testified that Ms. Johnson was responsible for the area where the incident occurred. According to Ms. Basped spill stations are located throughout the store. "They are located by, you know, every area that a spill could happen. They're like

within, you know, a few feet away." Pl.'s Mem., Ex. 5 (Basped Dep. 12:15 – 17). Ms. Basped described the contents at a spill station. "That would be the Spill Magic or I forget the other name, what it's called. There's another name for it which is a powder to contain the spill and, you know, sweep it up. A broom, a safety cone. Also absorbent pads, paper towels." *Id.*, Ex. 5 (Basped Dep. 17:2 - 6). Ms. Johnson had a duty to inspect and maintain the area she worked. *See id.*, Ex. 2 (Answers to Interrogatories No. 5); Ex. 5 (Basped Dep. 18:8 – 12). Additionally, managers and assistant managers periodically walk the store.

In assessing the factual evidence and inferences to be drawn therefrom in the light most favorable to Mrs. Groat, if Ms. Johnson was aware of the spill *before* Mrs. Groat encountered it, there is no evidence regarding *how long the spill was on the floor*. Ms. Johnson would have had to become aware of the spill in sufficient time to have an opportunity to warn shoppers or resolve the dangerous condition. *Carter v. Shoppers Food Warehouse Md. Corp.*, 126 Md. App. 147, 161, 727 A.2d 958, 965 (1999). The spill may have occurred a minute before Mrs. Groat's encounter with the liquid laundry detergent. If Ms. Johnson noticed the spill and then left the area to retrieve supplies from the spill station, is a minute or two sufficient time for Wal-Mart to correct the dangerous condition or is such a short period of time insufficient and unreasonable, not permitting Wal-Mart an opportunity to correct?

Mrs. Groat charges Wal-Mart failed to warn patrons like herself of the spill by placing safety cones or other devices by the spill. Mrs. Groat overlooks the fact that the safety cones are not located in every aisle but, according to Ms. Basped's uncontested testimony, are located at the spill stations. Thus based on the evidence presented, Ms.

Johnson would have to go the spill station to retrieve a safety cone, along with the supplies to wipe up the spill. Again, how much time is sufficient to give Wal-Mart an opportunity to correct the dangerous condition or warn its invitees?

The Court cannot answers the questions posed in the two previous paragraphs because Mrs. Groat has not produced "evidence that the dangerous condition *had existed for a sufficiently long period of time for the owner or his employees to correct it or to warn his invitees*." *Keene*, 35 Md. App. at 258, 370 A.2d at 129 (emphasis added). Mrs. Groat asks the Court to speculate. "[The] inference must . . . be a legitimate inference and not a mere speculation or conjecture. There must be a logical relation and connection between the circumstances proved and the conclusion sought to be adduced from them." *Rawls*, 207 Md. App. at 119, 113 A.2d at 408 (quoting *Benedick v. Potts*, 88 Md. 52, 55, 40 A. 1067, 1068 (1898)). Mrs. Groat has not met her burden and therefore fails to establish Wal-Mart's negligence.

## CONCLUSION

For the foregoing reasons the Court finds there are no genuine issues as to any material fact and Wal-Mart is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An Order will be entered separately.


 December 20, 2010 _____                    _____/s/_____
             Date                                        WILLIAM CONNELLY
                                            UNITED STATES MAGISTRATE JUDGE